Let's see, we have need opposing counsel. Here we go. That's all right, we'll wait. No, that's okay. Take whatever time you need to get your papers in order. Go right ahead, sure. Okay, Mr. Jeffrey. Good morning, I'm Jim Jeffrey. I have the honor of representing Grand Prairie Police Officer Lance Montee. Because of time constraints, I want to focus on the clearly established law component of the qualified immunity issue before this court. No clearly established law instructed Officer Montee that despite the lawfulness of using a canine for the initial seizure of the knife carrying athletic, violent, dangerous Escobar who had desperately fled at night, Montee was then prohibited from allowing the canine to continue holding Escobar during the following 20 to 30 seconds it took for the other officers to handcuff him. And I point out that since the time... The officers had been told that he had indicated he was going to put up a fight, is that right? His mother told the officers that he would have to be killed to be taken in. His own mother. His wife reported he had a knife. It's undisputed he had a knife, and it's undisputed that he dropped it and it remained within reach while this struggle was going on with the dog and the officers. And I'd like to point out that since the time of the district court's ruling in March of last year, there have been a number of significant qualified immunity rulings that reemphasize how you analyze clearly established law. Starting with Wesby v. District of Columbia, I submitted a letter brief on that, and Wesby makes it clear that the law must prohibit the officer's conduct. Just last month, Judge Clement issued two rulings in cases involving qualified immunity. The Lincoln v. Scott case at 887 F. 3rd 190, and Romero v. City of Grapevine, which is so new it's only a Westlaw case, but it's case number 17183. You can find it at 2018 Westlaw 1885545. The Wesby case, the Lincoln case, the Romero case, and then earlier this year, this court's Vann case have all made it clear that clearly established law requires careful attention to the facts and that the facts must be so close that they squarely govern the circumstances, and the law must prohibit what the officer did. The only cases that have been cited at the district court level by the district court or by my opponent or cited here do not involve the kind of circumstances that we're confronting Officer Monte. We have a violent suspect. He's athletic enough that he's reportedly climbed and going roof to roof in this neighborhood at night. He's trespassed by climbing over multiple fences. He's a large man. He's 6'2", which is my height. He's younger and stronger. He's 200 pounds, and he's beat the tar out of his wife. You can listen to and watch and read the police dispatch report. The car where the beating took place is reported by an officer at the scene when they find it as having blood and handprints on it. So in this case, Judge Fitzwater is a very long-experienced judge. He's been on the bench over 30 years and is a very careful judge. Obviously, you're appealing his ruling, and he makes mistakes like everyone else, but in looking at what he did and how he ruled here, where do you suspect that Judge Fitzwater went wrong in his analysis? Where he went wrong in his analysis is that he was splitting things in this admitted roughly 50 to 60-second time interval where the judge held that the initial seizure by the dog was lawful because of the circumstances known to the officer. The officer did not have to give a prior warning, and he could use the dog to go seize this suspect. Where Judge Fitzwater went wrong is he determined that because the suspect now claims that he was trying to surrender, that Officer Monte should have known this and should have called off the dog sooner. We don't know when he should have called him off, but sooner. And when you're looking at qualified immunity, as the courts have made it quite clear in the last few months, the law must prohibit what the officer did or failed to do. So we have this event that lasts a minute or less, and the officer is supposed to perceive that this man has shown every indication except surrender is genuinely surrendering. And I cite to this court and to the lower court the Eleventh Circuit's Crenshaw case. And I think Crenshaw is important because, Judge Smith, in your Cooper v. Brown case, you look to the Eleventh Circuit. And in the Eleventh Circuit, you pointed to the factually similar Priester case. And the Eleventh Circuit's Priester case involved a misdemeanor offender who is not suspected of a violent crime or a dangerous crime, was not suspected of having committed any act of violence, of having a weapon, or being a danger to the officers. And in Priester, as in your Cooper case, the dogs were used to hold and seize the suspect for an extended period of time. Well, Crenshaw distinguishes Priester and explains that the reason an Eleventh Circuit Crenshaw case, because in Crenshaw you have a suspected violent suspect who is suspected of armed robbery, who also flees, who tries to get away. That suspect actually announces to the police, here I am, I'm over here, because he knows they're coming after him with a dog. The officers use the dog anyway to seize and hold him. And he was actually bitten 32 times in comparison to the two times that Mr. Escobar was bitten here. And in the Crenshaw case, the Eleventh Circuit said, essentially it was immaterial that the suspect claimed he was surrendering. The officer, according to the Eleventh Circuit in Crenshaw, did not have to risk his life to find out if it was a genuine effort to surrender. And here, even if you credit Mr. Escobar's claim that he was surrendering, he's this dangerous athletic man who's been climbing across roofs and yards, is known to have a knife, has vowed to be killed instead of taken alive. It's undisputed the knife remained within his reach even after he says he dropped it. And the helicopter pilot, who is actually the only one who has eyes on him before the seizure, says he's hiding under the awning, leaning against the glass door. He advises the officers of that, and he cautions the officers not to spook him because he might push through the door and get into the house where there could be innocent occupants. The officers then try to make contact with the occupants of the house. They're unsuccessful, and the helicopter pilot confers with them again, suggesting use the dog because the officer's plan at that point was to go in guns drawn. So they were showing restraint. And this suspect, who's done all of these things, evidencing everything but an attempt to surrender, is somebody that the dog seized and held until the officer ordered him to be released. And it's undisputed that as soon as a command for release was given, the dog released. It's also undisputed during the entire time the dog was holding him after the initial seizure that the officers, and you can see parts of it on the video, that officers are struggling to get him handcuffed. And so there's no case that's been cited, and I don't think there can be, where a court has prohibited using a dog to seize and hold the suspect until the suspect is handcuffed and secured. And that's what we have to look at under qualified immunity analysis. And here, even if you apply the Graham factors and note that it's also recognized that under Society of the Cats, if an officer makes a mistake as to his thought that the suspect might fight back, it's still not unreasonable or excessive force as long as it was a reasonable but mistaken belief the suspect might fight back. And here... That's, of course, quite sound law. In its application, it gets a little more complicated, though, doesn't it, in that the set of facts that to which the question is what set of facts could the officer have reasonably perceived there. Now, if you have a conflict in the underlying two different versions of what happened there, what he could have been seeing, then you have a... I think that's where Judge Fitzpatrick went either right or wrong, relied upon in terms of finding a fact question that really cannot be resolved at that juncture in resolving the issue of the defense of immunity. The defense of immunity, even if you went to trial, is still there, but it just doesn't protect you from the trial because you've got to determine the underlying fact. I'm not suggesting that that is an operative principle. If you want to comment on it here, that's helpful. Yes, I will. On this type of appeal, we can challenge the district court's determination of the materiality of a fact conflict, and that's exactly what I'm contesting. I use the 11th Circuit Crenshaw case as persuasive authority for that. In Crenshaw, the same alleged fact issue existed. The suspect said, I'm giving up, and the officer should have known that. Nonetheless, the suspect in that case was subjected to about two minutes of dog bites, 31 bites total. Here, we're talking about a 20 to 30 second period of time, and the officer, and I would submit it's perfectly reasonable. When you view both the Fourth Amendment objective reasonableness and the qualified immunity reasonableness, the presumed reasonable officer at the scene perspective, I think that the law is clear, and I use Crenshaw as support for this, that the officer reasonably could perceive that this is not a genuine surrender attempt. And I point out. Your argument is that under the uncontested facts here, the officer could have reasonably perceived the threat of danger. That's correct, even giving the facts to the plaintiff that Judge Fitzwater stated. And what I point out about the importance in these dog bite cases of looking to the particular facts. In the Cooper v. Brown case, Judge Smith's opinion, look to the 11th Circuit Priester case. The 11th Circuit itself in Crenshaw distinguished Priester, and then the case I cited in our briefing, Bird v. Bossier City. Again, that was a dog bite and a beating case, alleged beating. And in a footnote, footnote three in the Bird case, another panel of this court looked at the differences in the Priester, the Crenshaw case within the 11th Circuit and noted that because of those differences, you had different outcomes. And then there was also a reference to, I think, a 9th Circuit case in that footnote. And so looking at what the Supreme Court has said most recently in Wesby, and they've said it in Mullinex. I'll finish my sentence and wrap up. But they've said it multiple times in the most recent opinions by Judge Clement. You have to look at the facts and those facts that have to be similar enough to control. And here there's nothing cited that would defeat immunity. Thank you. Thank you, Mr. Jeffrey. You've saved time for rebuttal. Yes, Your Honor. Mr. Henley. Thank you, Your Honor. May it please the Court. I'm Jeff Henley on behalf of Israel Escobar. We have two issues before the Court. One is obviously his appeal, and the other one is obviously our cross-appeal. With respect to the facts, there are several very significant omissions that counsel had made. That helicopter whirled around that house for at least 13 minutes and hovered and shined the light eventually. And that Israel Escobar remained in a fetal position. You can go back, listen to the radio, the audio. He has a very distinctive, almost sort of a John Wayne voice narrating for you, talking about how he's positioned, communicating with Lance Monty and all of the officers in the field. There are two in the back, and then Monty has Bullitt, and then another four officers with him, and then there are other officers in the area. So they had what is a veritable platoon out at the scene. Most of the cases that you read about with respect to the canines are frequently one-officer cases where one officer, a canine officer, is by himself in a confined area or a wooded area like in Crenshaw. We have other cases where the dog is used and other officers have the gun drawn, but they stick the dog on where they shoot him. Yes, Your Honor. And in those instances, there would have been a distinct threat. But in this case, as we know, they knew precisely where Israel was. He was in a fetal position against a wall. Where was his knife? Your Honor? Where was his knife? At that point in time, the only thing that they had heard about was through the radio that the mother had said he had a pocketknife. But, Your Honor, I understand, and I think his knife at that point in time was in his hand. His mother said pocketknife or she said knife. Your Honor, and that's true. I think it was a knife. I don't know that they understood it to be a pocketknife at that time. The man's armed. He had a bladed instrument. And at that point in time, I think Your Honor is correct in the sense that they didn't know where it was, whether it was in his hand or in his pocket, in his sock. But when they round the corner, and this is where I think our points kind of converge. I mean, there are a number of places where both sides kind of agree on some of the core facts. And in some respects, we even agree on sort of the difficulty that the decision that Judge Fitzwater made. Obviously, the officer ever would draw his weapon? He hasn't been deposed. None of these officers have been deposed. And so what we do know that— No one has suggested that he drew his weapon. Rather than draw his weapon, they used the dog. I thought that's what happened on the record before us. I don't believe that he did draw his weapon. And he might have once he got around the corner. What we have is the thermal imaging of the officers going beside the house. And notably, Bullitt is still on his lead before—and then Bullitt runs past the patio. Let me give you a parallel set of facts to just kind of test this. I apologize. The same set of all facts remain the same. The officer had this report, et cetera, et cetera. And he's got to climb the fence? Apparently he did. Okay. But he—in other words, he doesn't—he has no dog. He just has a gun. Yes, sir. Okay. Now you play that out, and you can have a fatal shooting on your hands. In other words, the officer climbs over, and he doesn't know what to expect. He knows the guy's got a knife. He's exposed in that period of time. And then all it takes is one movement or whatever, and then the officer can fire. And Your Honor is touching a very good point, and that's what I think one of the— Well, that's one of the reasons we have police dogs, because it is a lesser deterrent at the outset. And because the police dog has a couple of things that individuals can't do. They can get into smaller areas. They can get into darker areas. They're commonly used in warehouses, forests, like in Crenshaw, really thickly wooded areas. Largely because they have a powerful sense of smell. They can find things that human beings can't. And, of course, the risk to— They can do all of those things. And they also, when the dog and the shepherds come up, when they go after them, if it's a male suspect, then the experience is and their training is that their hands are going to come down. And so they can see his hands and see what's going on. What I'm suggesting to you is that in terms of the reasonableness of force is that the very election to use the dog rather than to just withdraw his weapon and to proceed with caution in and of itself ought to add into the calculus, shouldn't it? It should, and here's what happened. On the radio, Corporal Monti, I believe it was Corporal Monti, is communicating with the chopper, and he says that he's going to use lethal and nonlethal, and then I think that there's a suggestion that that is in addition to bullet, that perhaps what he's going to have is presumably a taser. It was never enunciated that way, but that that was going to be an option. A taser may pose a greater threat to an individual than the dog. It may not be as terrifying in one sense. Well, the thing about a taser is it does not have, although in very rare instances can be fatal, as well as dog bites can, it does not have nearly the ability to cause severe permanent injury like we have in this case where our client has had collagen injections. He had literally four square inches of flesh and muscle and tissue ripped out of his calf and continues to walk with an intelligent gait. So with the decision to let slip the dog comes about. It is one that cannot be lightly made, and that's why there are several circuits that say. That's not a suggestion. It's a question of it's just in the calculus of the choice of responses, the level of response. I was just suggesting that one is almost inevitably a gun is lethal in a way that no other weapon is, and a dog frequently over the years, and they don't inflict that much damage. That one did, but there may be a reason for that too. I could not agree with you more regarding the lethality of a firearm. Absolutely. There's no argument there. It is by far the only weapon under law that is defined per se as deadly. But the reason that the very thing that's very different about a dog, it's the same thing that's very different about something that the courts are going to be confronting with greater frequency in the future, and that is the use of robots and other automated devices that can go in. That's sort of a slur on dogs, I must say. I'm sorry? That's sort of a slur on those trained dogs. They're extraordinarily responsive. Well, certainly. And I thought part of your argument would be that the dog is very responsive and the police officer didn't turn him off. But before a robot is deployed like what was used in Dallas to take out the individual who shot all the police officers, a verbal warning is given. And that is what was missing in this case, and that's what several circuits require so that we don't have this discussion about, well, you know, at least he didn't get shot. What would the verbal warning be? As the International Association of Chiefs. Here, what do you say? Come out, surrender, lay your hands down, make them available, or we're going to send in our dog. We have a dog, and we're going to release him, and he's going to come and bite you. And those are the kinds of warnings that are typically rendered in these cases. They will literally tell the suspect in hiding, this dog will come and bite you. And it's pretty persuasive. I mean, whether Bullitt was a Malinois or a Shepherd, I think I got a little confused at one point. I don't know which one. But a Malinois is a little very similar to a Shepherd. It's about seven pounds lighter, has more endurance, is better trained. The Navy SEALs use them. Both of them have tremendous power and tremendous authority to rip apart. They can break a forearm. They can break an ulna and tear up things. And people relent. And I'm confident that Israel Escobar, at least that's what his affidavit indicates, that when he knew the dog was coming, he stretched out like a parachute man. And the affidavit further indicates that despite knowing that, Officer Monti didn't do anything about that and that he continued to let Bullitt devour Officer Monti's leg, requiring surgeries and resulting in infection and cellulitis. Now, what I will also say to you— Did your client go to jail? I'm sorry? Did your client go to jail? Was he convicted? He did, and he pled. Yes, he did. And while he was leaning up against this glass door that was described by Mr. Jeffrey, did he ever say, I surrender? He never uttered a word, Your Honor. Right. And, in fact, it was as it indicated, it's more of a leaning, lying on the ground in a fetal position. But, no, he never volunteered. They never asked. He was still hiding. He was still under the—he was still on the patio. Okay. The—with respect to the warnings, though, multiple circuits have said, look, generally a warning is required because the viciousness of the attack— Now, he was outside of the fence, and the suspect inside, and he can't see him, and he should have given the warning that I'm going to do what? Or I'm going to send the dog. What should have instructed him to do? They should have instructed him to either—well, here's what's interesting. In the pleadings itself, as we pled in paragraphs 15 through 19, when Officer Monte comes around the corner, he says, get on the ground, get on the ground. Well, that's obviously what he wanted to do, and it's a very common police command, right? Get on the ground where we can control you better. Sometimes you'll hear people say, show your hands, show your hands, particularly if you're in an automobile, but commonly when you're outside, get on the ground, get on the ground is the most likely statement. Well, number one, he's already on the ground. He is complying, and this is where we believe that the district court made an error because we were focused so heavily upon everything else, and it's easy to see how Judge Fitzwater would have missed it, and it wasn't something that was as emphasized to us because we firmly believed it before. Look, the fetal position and laying down are ipso facto manifestations of surrender, but they were more than that in our pleadings, and they were more than that in the facts, which is he was doing so before, after, and in response to a direct command to get on the ground. And as a result, it goes back to, now he didn't say, you know, he didn't yell, get on the ground, show us your hands, but I'm confident that had he done so, and if he didn't do so, then maybe some application of force might have been necessary. What weight do we or should we give to the warning from the mother? It obviously has some weight, but I think the real thing that matters the most in this case is as your decision in Cooper relying on Edwards versus Shanley, these situations are not static. They're dynamic, and that statement that the mother had made regarding him having a knife and, quote, had to take me a lot or, you know, I'm not going to let them take me, I understand. It sounds like an ultimatum. It sounds inflammatory, but it was also a statement made, you know, 30 minutes ago to not an officer, not a direct officer of law. He didn't challenge that. My question is could an officer have that information? With that information, then the question is whether a reasonable police officer could have seen a threat to his person or another. It's certainly something to take into the calculus, and Graham obviously takes something like that into the calculus, but I think that you have to look at how the math changed 20 or 30 minutes later when this man is, you know, huddled in a fetal position on the ground. And going back to so many cases that we've reviewed, there's only like one or two where a warning was not even given. Even in Crenshaw, what was absolutely distinguishable from our facts, and this is probably one of the reasons why counsel has mentioned it, is in Crenshaw the defendant slammed into a patrol car during a chase and then used his own vehicle as a battering ram against an officer, so he actually committed an aggravated assault against a pursuing officer. He then fled into a heavily wooded area, which the officers literally had to crawl through, and the suggestion of the 31 bites, if you read further into the case, he had 31 puncture wounds. Dogs have lots of teeth. One could easily imagine that he didn't take nearly 31 mastications of his jaw bones, but that he literally had 31 puncture wounds. Well, if you look at the photographs of Israel Escobar, he had probably a similar number of puncture wounds if you were to take time, and I'm not necessarily inviting anybody to do so. But in Crenshaw, he didn't have surgeries. He didn't have cellulitis. He didn't have infections. At least there was no record of it. Crenshaw, we may recall, was pro se in his application. And he had even submitted a number of things. Also in the calculus, do you agree that the police officer's general awareness that domestic abuse situations are volatile and there's no crime in the sense of robbery or whatever, it's a serious family fight of some sort, that they know from experience that those are very dangerous situations in producing substance? They certainly can be. That's the experience that a lot of these different confrontations that end poorly draws out of those abuse situations. It is certainly a crime of violence, and it is a crime of emotion in that respect. But I think it's, again, important to recognize the dynamic here of the passage of time. As you recognized in Cooper v. Brown, things have changed. And the other thing that I think that's important to come to or analyze is that this premise that things have to be just so conclusively established, you know, where you have to have a case exactly as indicated, that's not the law. That is not in the whole principle, as Justice Smith has pointed out. Is there fair warning? And under these facts, we absolutely have so. And we've indicated that there's been a robust consensus. The high court is requiring a—it is known, and I agree completely with that, but the high court is requiring a good bit of specificity in that warning. Yes, yes. And I think that in the area of dog bites— I mean in terms of the availability of authority sufficient to deny immunity. Well, and what I was going to say is with respect to dog bites, this court has actually already ruled, and it wasn't something that I'd completely appreciated until even a couple of days ago, and that was in affirming Malone, the case written by Judge Means in Fort Worth. And in Malone, Judge Means cites to the Fourth Circuit and says, look, generally a warning is required in these circumstances. And upon review, this court found no error. Now, I don't know if there was—how much discussion there was about, you know, putting forth the idea of abandoning that notion, but the fact is is here it would seem that we have a number of circuits that have said, look, a warning is required because dogs are—dogs in the sense of— I agree with the premise that, yes, they do respond, but they also have to be contrained completely and repeatedly because if you read Campbell out of the Sixth Circuit, there was one dog that they were not letting get certified. His certification lapsed and he stopped operating and responding so quickly and he devoured a couple of people. But beyond that, it is the fact that when somebody gets bitten by a dog, and we all love dogs. I've got a chocolate lab who, you know, you could not pry that thing from my hands. But the fact is when a dog bites you, you're going to wiggle. You're going to squirm. You're going to do a large number of things that are very unpredictable. And so there was no evidence, and we absolutely will indicate this, there was no evidence of resistance that they've offered. There was no evidence of any fighting or any direct threats made to any of these officers. And we have appreciated your time on this day. Thank you, Mr. Henley. Mr. Jeffrey, you saved time for rebuttal. Thank you. I'll start with where Mr. Henley left off. When a dog bites you, yes, you're going to squirm. You're going to do something. You're going to react. And he stated that your action is unpredictable. In the Malone case, Judge Means in Fort Worth recognized that when a dog is biting a man's scrotum, he's likely not to be able to keep his hands in view because he's going to be using them to push the dog away. Here we have a man who told his own mother, I'm not going to be taken alive. And parsing this incident, this event, into 20- and 30-second pieces, the ruling that was issued by the district court would require that officers under these circumstances, knowing all they knew about Mr. Escobar, are going to be forced to assume that he is both legitimately surrendering and while the dog is holding him, that he's not going to try to reach for the knife that is indisputably within his reach. And the law doesn't require that. The law has never required an officer to risk their life to find out exactly what a suspect is going to do. And I'd like to talk about the warning requirement. In Tennessee v. Garner, 1985, the Supreme Court stated that a warning in the use of deadly force, preceding the use of deadly force, is only required if feasible. And my opponent's briefing cites and states, black letter, that the Fourth Circuit always requires a warning. And that's simply not true. The Fourth Circuit itself, in the Rogers v. Smith case, which I cite in my briefing, recognizes that a warning is only required before using a dog as a general rule, but that if the suspect could gain an advantage from the warning, the officer doesn't have to give a warning. And in that case, the suspect was believed to have kidnapped his girlfriend at gunpoint, and when the officers were closing in on him with the dog, one of the officers yelled, gun, as an indication that they thought they saw a gun, and so the dog was released without warning to seize and hold the suspect until he was secured. So even in the use of deadly force, a warning is not always required. No circuit has held that a warning is always required before using a dog. The thing that I'd like to point out to the Court is the helicopter pilot, the only officer who had eyes on Mr. Escobar, not the pilot, he's the officer riding next to the pilot, while the pilot is driving the machine, the officer who could see Mr. Escobar during this 13 minutes that he supposedly huddled in a fetal position knows the same thing that the officers on the ground know. In fact, the helicopter pilot even checks to make sure that the officers on the ground had heard about the knife and had heard about what Mom said. And with that information, even though the helicopter pilot is the only one who can see Mr. Escobar, and the helicopter pilot is the one who describes his position as sort of a fetal position, and the thermal imaging, I wouldn't call it a fetal position, but I don't know what you'd call it, it's as good a description as any, but he's against a glass door to a house that could be occupied, has two vehicles parked in the driveway, and the helicopter officer is describing the vehicles to make sure the officers know which house they're in front of, the right house. And that helicopter officer basically says, we want to take care that he doesn't get spooked and push into that house and confront innocent people. And during that dialogue is when Officer Monte and the officers on the ground decide they're not going to go in guns first, they're going to use the dog. And so I would submit, in this fast-moving situation, when you look, as you're required to do, and as the Supreme Court has repeatedly stated, most recently in Wesby, and as Judge Clement's recent opinions in the Romero case and in one of the decisions involving the Lincoln case, you have to look at the controlling facts. And unless those controlling facts prohibit, the court, considering those controlling facts, has prohibited the officer's conduct, the officer's entitled to immunity. Thank you. All right, thank you, Mr. Jeffrey. Your case and all of today's cases are under submission.